IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
TENNESSEE WESTERN DIVISION

**TODD LACKIE, and wife,**
**ALICIA LACKIE**

    **Plaintiffs,**

v.                                                              No. 2:11-cv-02181

**E.I. DUPONT DE NEMOURS and**
**COMPANY, and MID-SOUTH RAIL &**
**CONSTRUCTION, LLC**

    **Defendants**

## DEFENDANT MID-SOUTH RAIL & CONSTRUCTION LLC'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT MID-SOUTH RAIL & CONSTRUCTION, LLC'S MOTION FOR SUMMARY JUDGMENT

Defendant Mid-South Rail & Construction, LLC, ("MSR") pursuant to Rule 56 of the Federal Rules of Civil Procedure hereby files its Concise Statement of Undisputed Facts[1] in Support of its Motion for Summary Judgment and states the following:

1. E.I. DuPont de Nemours and Company ("DuPont") owns the railroad tracks inside the fence at the DuPont facility in Millington, Tennessee (the "facility"). (Dep. of McCracken-Hunt, 19:21-23; 45: 16-17; Dep. of Hart, 71:11-13)

2. DuPont purchased, owns, and controls the switch stands at the facility. (Dep. of Crissey, 82:8; Dep. of McCracken-Hunt, 132:7-8; Dep. of Benjamin, 74:15-16).

---

[1] Defendant stipulates that the following facts are true for purposes of this Motion for Summary Judgment only. Defendant reserves the right to contest any of the facts contained in this filing for all purposes other than this Motion for Summary Judgment.

3. In 2010, the ultimate decision on whether to repair or replace something at the facility would have been made by DuPont. (Dep. of Crissey, 86:6-12).

4. DuPont is responsible for the maintenance of all tracks inside and outside the fence ("new yard"); this includes repairing the tracks and switch maintenance. (Dep. of McCracken-Hunt, 45:18- 47:7).

5. MSR began working at DuPont as a resident contractor in 2003. (Dep. of J. Banks, 55:24-56:2).

6. MSR was originally contracted with DuPont to maintain the existing railroad equipment at the facility. (Dep. of G. Banks, 35: 2-4).

7. As a resident contractor, MSR was at the facility almost daily until MSR was moved to a non-resident, as-needed, status by DuPont. (Dep. of Chandler, 10: 11-23).

8. In March of 2009, MSR became an "as-needed" non-resident contractor at the facility, and would only work when DuPont Assistant Contract Administrator, Ms. Zelma McCracken-Hunt called it to work, and would only perform the work that Ms. McCracken-Hunt instructed it to perform. (Dep. of Chandler, 10:19-21).

9. Once MSR became a non-resident, as-needed, contractor, DuPont could call another maintenance company. (Dep. of G. Banks, 32:22-24).

10. After March of 2009, MSR no longer inspected all of the switches at the facility every Friday. (Dep. of J. Banks, 83:4-7).

11. Once MSR became an as-needed/non-resident contractor the responsibility for adjusting and oiling the switches went to Railserve, Inc. (Dep. of G. Banks, 101:22-102:3).

12. Railserve has provided service to the DuPont Memphis facility since 1990, and is the "oldest and largest third party switching company in North America." (Dep. of Benjamin, 8:24; 9:2; 51:1-2).

13. According to Railserve President, Mr. Benjamin, Railserve has 72 locations and its employees throw ground throw and bow-handle switches "all day every day and we don't have problems with them." (Dep. of Benjamin, 92:17-21).

14. In 2008, 2009 and 2010, probably ninety percent (90%) of the Railserve sites used ground throw switches. (Dep. of Lammers, 59: 18-23; 60:2).

15. Plaintiff Todd Lackie ("Plaintiff") began working for Railserve in April of 2008, working the second shift. (Dep. of Pltf. T. Lackie, 26: 10-12; 28: 8-11).

16. Railserve and DuPont communicate regarding the condition of the switch stands at the facility through written Track Exception Reports (hereinafter "TER") that are sent from Railserve to DuPont. (Dep. of Lammers, 5:19-24; 42: 22-25).

17. According to Railserve Regional Site Leader, Mr. Lammers, "A [TER] is a report that identifies defects in tracks and that we give it a priority high, medium or low, as far as repair, and would describe exactly what is wrong to the best of our ability in the exact location." (Dep. of Lammers, 43:3-8).

18. TERs can be written by any Railserve employee including regarding whether a switch is hard to throw. (Dep. of Hart, 95:11-16).

19. In 2009 and 2010, Mr. George Hart was the Railserve Site Leader. (Dep. of Benjamin, 20:24-21:1; 24:10-12).

20. After DuPont receives a TER, DuPont calls MSR, and MSR then enters the facility to perform the work specified on the TER. (Dep. of G. Banks, 33: 5-10).

21. Once MSR became a non-resident/as-needed contractor it only performed repairs authorized by DuPont, as specifically stated on a TER. (Dep. of G. Banks, 90:2-4; 113:11-16; Dep. J. Banks, 25:1-3).

22. After March of 2009, MSR only worked on specific switches that MSR had received a TER for. (Dep. of J. Banks, 83: 8-11).

23. MSR was no longer inspecting the track because it could only perform what was listed on the TER. (Dep. of G. Banks, 113:17-20).

24. TERs never go directly to MSR. (Dep. of G. Banks, 117:1-9; Dep. of Hart, 189:24; 190:6).

25. Once completed, the TER was returned to DuPont. (Dep. of G. Banks, 91:11-12).

26. After becoming a non-resident contractor, MSR would not go to the facility unless it was responding to a TER. (Dep. of J. Banks, 23:20-25).

27. George Hart filled out a TER dated 11/20/2009, though he did not know where the information contained in the report came from. (Dep. of Hart, 83:6-11; 85:19; 86:16).

28. Regarding the TER dated 11/20/2009, though he indicated that the switch needed adjustment, Mr. Hart had never adjusted a switch. (Dep. of Hart, 87:10-12).

29. Mr. Hart also did not indicate the "priority of repairs," on the 11/20/2009 TER. (Dep. of Hart, p. 87: 13-20).

30. Mr. James Banks testified that he had seen the 11/20/2009 TER, (Exhibit 13, Deposition of Zelma McCraken Hunt), and that he performed the repairs called for in the TER at least by December 8, 2009. (Dep. of J. Banks, 101:14-23; 105: 22-25).

31. The handwriting on the TER from 01/13/2010 appeared to be Mr. Hart's, but he testified that he did not recall where the information on the TER came from, or if the TER ever reached MSR. (Dep. of Hart, 185: 25; 186:17).

32. The first time that MSR performed work at the DuPont facility in 2010 was on January 18th. (Dep. of Chandler, 27:23; 28:17).

33. Mr. Hart was not aware of MSR not completing TERs submitted to it in December 2009 or January 2010. (Dep. of Hart, 196:16-21).

34. Weather changes, not being lubricated, drainage issues, and trash can make a switch hard to throw. (Dep. of Hart, 36:25-37:1;100: 10-101:1).

35. Also, a switch can be hard to throw due to damage caused by a rail car. (Dep. of Rankins, 40:6-16).

36. Also, "mud, rain," and "rock" can make a switch hard to throw. (Dep. of Tune, p. 22: 10-12).

37. According to Plaintiff the ease in throwing a switch can vary from day to day. (Dep. of Pltf. T. Lackie, 116: 6-12).

38. Plaintiff did not step away from a switch handle that was hard to throw because he wanted to keep his job. (Dep. of Pltf. T. Lackie, 115:12-20).

39. If a switch is hard to throw it needs to be written up by Railserve on a TER because if not, then MSR would not know that there was an issue with the switch. (Dep. of Hart, 101:23-102:-4).

40. When MSR worked on a switch after March 2009, it made sure that the switch was in proper working order before it left the facility. (Dep. of J. Banks, 83: 12-18).

41. DuPont ordered and furnished all materials, including switch stands, and kept new switch stands in the railroad/lay-down yard. (Dep. of J. Banks, 34:22; 35:25; 65: 19; 66-1; Dep. of G. Banks, 35:5-15).

42. MSR did not order switch handles. (Dep. of G. Banks, 60:23-61:-2).

43. Mr. James Banks did not recall installing any switches in 2007, 2008, 2009, or 2010. (Dep. of J. Banks, 69: 6-25).

44. The decision to install bow handles or "Back-Safer-type," handles was DuPont's decision to make. (Dep. of G. Banks, 48:21-22) (Ex. "1" Aff. of R. Dean p. 10)

45. According to the written report of MSR retained expert, Mr. Roy L. Dean, P.E.

It is my opinion that Mid-South should not have recommended or suggested that the ball type switch handles be replaced at the DuPont facility in Memphis. The decision to change the design specifications of any track component is made by the owner of the track. Mid-South was working under contract to maintain the tracks in the DuPont facility. There was no more reason for them to make a recommendation to change the handles on the switch stands than there was for them to recommend that DuPont install continuous welded rail or change the physical layout of the facility to reduce the degree of curves. (Ex. "1" to Aff. of R. Dean, p. 10)

46. According to Plaintiffs' expert, Dr. Toby Hayes' written report from January 10, 2012:

In the DuPont document entitled Corporate Engineering Standard, section 3.11.1, it states, "switches shall be equipped with ergonomic switch stands furnished with reflective targets. Switch stands shall be completed with breakable lugs and foot latches." This document is dated May 2002. Therefore, DuPont was aware of the risks associated with manual switches, including ground throw switches, and as of 2002 should have both stopped installing ground throw switches and replaced all previously installed ground throw switches. However, as of 2010, only 1 out of 75 switches on DuPont property in Millington had ergonomic switches. In summary, less than 2% of the DuPont switches in Millington were compliant with their own standards. (Ex. "1" to Dep. of Dr. Hayes).

47. From 2009 to 2010, Railserve would go out and visually inspect the track and the switch stands at the facility. (Dep. of Hart, 102:11-17).

6

48. In 2008, 2009, and 2010, Railserve cleaned and lubricated the switches once per month at the facility and also inspected the switches once a month by throwing them to make sure they lined properly. (Dep. of Lammers, 92:24-92:3).

49. In 2009, 2010 if Railserve discovered that a switch was hard to throw it clean and lubricate it, and, if it was still hard to throw the switch would be written up. (Dep. of Hart, 103:20-104:-4)

50. If Railserve submitted a TER for a hard to throw switch to DuPont then DuPont would decide what to do. (Dep. Hart, 51:6-11; 94:24-95:2).

51. Beginning in the fall of 2008, Railserve cleaned and lubricated the Scale 6-IN, or Number 8 switch, once a month and continued to do so through 2009. (Dep. of Lammers, 50:22-51:3).

52. In 2010, Railserve began cleaning and lubricating the switches once every two (2) weeks. (Dep. of Lammers, 51: 4-7).

53. Mr. Benjamin was designated by Railserve to testify at deposition as to, Railserve and DuPont contract in force in January of 2010, and the Railserve scope of work under the contract. (Dep. of Benjamin, 11:18-12:-8).

54. Mr. Benjamin considered DuPont BATES22-24, "Exhibit A-3, Memphis Scope of work," as part of the Railserve contract from September 1, 2009 to August 31, 2012, explaining that it sets for the scope of work at the facility. (Dep. of Benjamin, 14:1-7; 15: 10-20; 16:10-12; Exhibit 36 of Dep. of Mr. Benjamin).

55. During his deposition, Mr. Benjamin read the following from Exhibit A-3,

> Switching crew leader will routinely report any track and defects to DuPont contract administrator via track exception notices. Switch points will be inspected, oiled and adjusted monthly. Bolts to be tightened as needed. DuPont-owned track will be visually inspected, parenthetically, walked, and a written report of the

7

findings deficiencies will be provided to the contract administrator (Dep. of Benjamin, 87: 14-23).

Repairs resulting from the above inspections will be the responsibility of DuPont's contract administrator and will be made as DuPont elects. (Dep. of Benjamin, 87:14-23; 88: 1-4).

56. Mr. Benjamin testified that this scope of work was in force on September 1, 2009. (Dep. of Benjamin, 88:7-13).

57. A DuPont engineer inspected the facility's tracks once a year. (Dep. of McCracken-Hunt, 111:20-24).

58. Canadian National Railroad inspected the tracks at the facility once a year. (Dep. of McCracken-Hunt, 113:7-10).

59. Plaintiff testified that he thinks the 6-IN Switch, or the number 8 switch, was the switch he was operating when he thought his back problem occurred. (Dep. of Pltf. T. Lackie, 115: 10-13; 139:6-7).

60. Plaintiff does not know what caused the number 8 switch to be hard to throw. (Dep. of Pltf. T. Lackie, 188:17-24).

61. Plaintiff returned to work on January 11, 2010 and worked his normal duties until his back surgery in April 2010. (Dep. Pltf. T. Lackie, 149:10-19; 150:1-7; 151:23-152:1; 152:8-14; 153:16-21; 157:17-19).

62. After his alleged injury, Plaintiff continued to throw switches because in part he was afraid that Railserve would fire him. (Dep. of Pltf. T. Lackie, 150: 10-18).

63. Plaintiff testified that he was not instructed to inspect switch stands, and he never oiled the switch stands. (Dep. of Pltf. T. Lackie, 119: 3-18; 123: 16-19).

64. Other than Plaintiff, Mr. Hart, Mr. James Banks, Mr. Gus Banks, Mr. Jesse Rankins, are not aware of anyone else being allegedly injuring his or her back throwing a switch. (Dep.

8

Hart, 18: 15-20; Dep. of J. Banks, 18:5-7; Dep. of G. Banks, 9:9-10; 68:9-11; Dep. of Rankins, 43:8-11; 45:21-24).

65. Dr. Francis Camillo is an orthopedic spine specialist and has been practicing medicine at Campbell Clinic since September 2004. (Dep. of Camillo, 7:4-11).

66. Dr. Camillo testified the charges of the Campbell Clinic are reasonable. (Camillo 8:17-19).

67. Dr. Camillo could not say whether charges of other medical professionals are reasonable. (Dep. of Camillo, 9:12-13).

68. Specifically, Dr. Camillo testified that he is not familiar with charges of anesthesiologists, or Crittenden Regional Hospital, and could not give an estimate of what would have been a reasonable estimate for the surgical suite. (Dep. of Camillo, 8:25; 9:1-13).

69. Dr. Camillo saw Plaintiff on referral from Dr. Trent Pierce in February 2010. (Dep. of Camillo, 10:10; and Exhibit 3 to Camillo's deposition).

70. Plaintiff told Camillo he hurt himself at work and that it was worse throwing switches. (Dep. of Camillo, 10: 14-15).

71. Dr. Camillo reviewed an MRI which did not show a disc herniation, but rather a grade 1 listhesis at L5/S1 with what appeared to be a bilateral pars fracture. (Dep. of Camillo, 11: 15-17).

72. A pars fracture is a stress fracture in the area of the vertebral body called the pars articlaris. (Dep. of Camillo, 33:11-13)

73. A pars fracture can cause one bone in vertebral spine to slip forward on another one. (Dep. of Camillo, 33:17-19)

9

74. This is in the medical condition he observed and diagnosed in Plaintiff. The pars fractures had caused spondylolisthesis. (Dep. of Camillo, 41:12-21).

75. When one bone in the vertebral spine slips forward on another it is called a listhesis or spondylolisthesis. (Dep. of Camillo, 33:19-24).

76. This is the condition Dr. Camillo diagnosed when he first saw Plaintiff. (Camillo 34:3-5)

77. Plaintiff may have irritated or aggravated it. (Dep. of Camillo, 11:18).

78. Plaintiff had bilateral pars fractures meaning there were fractures on both the left and right sides of his vertebral spine. (Dep. of Camillo, 34:6-9).

79. Plaintiff's condition was not an acute problem but more than likely was a chronic problem and probably developed earlier in his life. (Dep. of Camillo, 34:10-13).

80. The pars fracture caused pressure on the nerve root. (Dep. of Camillo 35:16-20).

81. Dr. Camillo performed a surgical procedure to remove the bone or lamina which was causing pressure on the nerve root and inserted hardware where the bone was removed to provide stability. (Dep. of Camillo, 35:21-25; 36:1-12).

Respectfully submitted,

**LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC.**

BY: /S/MOLLY GLOVER
MOLLY GLOVER, No. 016113
STEVE N. SNYDER, No. 025703
Brinkley Plaza, Suite 800
80 Monroe Avenue
Memphis, Tennessee 38103
Phone: (901) 527-0214
Fax: (901) 527-8224
molly.glover@leitnerfirm.com
steven.snyder@leitnerfirm.com

10

*Counsel for Mid-South Rail & Construction, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of April 2012, a copy of the foregoing electronically filed instrument was served on the parties listed below by first-class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party, and/or via email:

| | |
|---|---|
| PHILIP E. MISCHKE, No. 010063<br>AHSAKI E. BAPTIST, No. 025884<br>Wyatt, Tarrant & Combs, LLP<br>1714 Aaron Brenner Dr., Suite 800<br>Memphis, TN 38120-4367<br>(901) 537-1052<br>pmischke@wyattfirm.com<br>abaptist@wyattfirm.com<br>*Attorneys for E.I. DuPont de Nemours and Company* | MARK LEDBETTER, No. 017637<br>Halliburton & Ledbetter<br>254 Court-Suite 305<br>Memphis, TN 38103<br>(901) 523-8153<br>Mark794@aol.com<br>*Attorney for Plaintiffs* |

By: /s/MOLLY GLOVER
     MOLLY GLOVER